IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL TORCHIK, | ) | Case No. 1:23-cv-1006 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Paul Torchik, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 6.

Torchik challenges the Administrative Law Judge's ("ALJ") evaluation of the opinions of Torchik's treating sources, her explanation of how she made her RFC findings, and her failure to include the use of a cane in the RFC.  However, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Torchik's applications for DIB and SSI must be affirmed.

I.      **Procedural History**

On February 3, 2021, Torchik filed an application for DIB and SSI.  (Tr. 15, 70, 87, 94, 189).  Torchik initially alleged a disability onset date of March 28, 2015, (Tr. 15, 70, 78, 198, 229), and asserted that he was disabled due to kidney issues, alcoholism, sleep issues, and

anxiety, as well as illnesses, injuries, or conditions relating to his lower back, thighs, and knees, (Tr. 70, 78, 222).  His applications were denied at the initial level, (Tr. 70-85), and then upon reconsideration, (Tr. 87-100).  He then requested a hearing.  (Tr. 128-129).

A hearing was held on May 16, 2022 before ALJ Penny Loucas.  (Tr. 37-67).  At the hearing, Torchik amended his alleged disability onset date to March 29, 2019, indicating the original date reflected a typographical error.  (Tr. 15).  The ALJ denied Torchik's claims in a June 28, 2022 decision.  (Tr. 15-30).  On April 4, 2023, the Appeals Council denied further review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  On May 18, 2023, Torchik filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Torchik was born on November 8, 1968 and was 50 years and 4 months old on the amended onset date.  (Tr. 70, 191, 198).  Torchik completed his high school education. (Tr. 223).  Torchik's past relevant work was as a brick layer from 1992 to 2013.  (Tr 223).

### B.    Medical Evidence

On September 12, 2019, Torchik had an appointment with Kristen Smith, M.D., concerning his experience with frequent falls and tremors in his legs, which had started a year earlier and had worsened in the previous three months.  (Tr. 2125).  Torchik's review of systems and general examination were largely unremarkable, with his gait determined to be "within normal limits except marked failure of tandem gait."  (Tr. 2126).  Dr. Smith assessed Torchik with astasia-abasia (inability to stand or walk in a normal manner) and unstable gait.  (Tr. 2125). Dr. Smith also requested an electromyography ("EMG") for further assessment of Torchik's lower extremities.  (Tr. 2123).

On November 18, 2019, Torchik had a follow-up appointment with Dr Smith.  (Tr. 2120-2021).  Dr. Smith diagnosed Torchik with chronic lumber radiculopathy and prescribed Meloxicam, after finding that the EMG revealed Torchik had mild S1 radiculopathy, and he needed physical therapy.  (Tr. 2120).  Torchik's physical examination demonstrated normal strength in all extremities and normal gait except for a marked failure of tandem gait.  (Tr. 2121).

In August 2020, Torchik was admitted to Lake West Hospital for hyponatremia, septic shock, and alcohol withdrawal, and he was discharged to a skilled nursing facility (Heartland of Mentor), for occupational and physical therapy in mid-September 2020.  *See generally* (Tr. 511-1000, 1007-1026).  During his time at Heartland of Mentor, Torchik was readmitted on two separate occasions for further treatment of respiratory failure, alcohol withdrawal, acute kidney failure, and pneumonia.  *See* (Tr. 513-514; 1270-1276, 1800, 1837, 1846-1847).  Torchik was ultimately discharged from Heartland of Mentor in mid-October 2020.  (Tr. 1069, 1180, 1846).  During his stay at the nursing facility, Torchik underwent physical therapy and rehabilitation with therapy notes demonstrating that Torchik suffered from ongoing gait dysfunction and generalized muscle weakness in his lower extremities.  (Tr. 1035-1054).  Torchik's discharge summary: (i) indicated that physical therapy had resulted in a general improvement of symptoms; (ii) noted knee instability and ambulation that required a wheeled walker; and (iii) recommended home health services.  (Tr. 1121-1123).

Torchik was admitted to the Windsor Laurelwood Center Behavioral Medicine for alcohol detoxification and psychiatric care on February 23, 2021, and he was discharged on March 5, 2021.  (Tr. 2054-2058).  The discharge summary noted that: (i) Torchik's medical history included "complaints [of] bilateral leg pain, back problems, cirrhosis, and arthritis[,] . . . prior addiction treatment for alcohol dependence[,] . . . chronic bilateral thigh and back pain"; and (ii) upon physical examination, Torchik used a wheelchair due to leg weakness but was able

3

to walk.  (Tr. 2054, 2056).  Upon discharge, Torchik's mental examination was unremarkable; he displayed improved mood; and he was diagnosed with major depressive disorder and hypertension.  (Tr. 2056, 2058).  On February 28, 2021, during his two-week stay at Windsor Laurelwood, Torchik was admitted to the emergency department at West Medical Center and treated for hypertension.  (Tr. 1939-1941).  Treatment notes demonstrated that Torchik had 5/5 strength in all extremities, no ataxia, and no tremors.  (Tr. 1940, 1956, 2011, 2027).

On February 28, 2021, Torchik was seen at the Lake Health emergency department and diagnosed with essential hypertension.  (Tr. 1954-1957).  Julie A. Pokersnik, M.D., stated that Torchik had no chest pain, no neurological symptoms, and no indication of hypertension emergency.  (Tr. 1957).  She further noted that Torchik did not have any other evidence of alcohol withdrawal, and she determined that the cause of the hypertension was multifactorial.  (Tr. 1957).

On April 16, 2021, Torchik had a follow-up appointment with Dr. Smith concerning his lumbar radiculopathy.  (Tr. 2117).  Dr. Smith noted Torchik's complaints of general instability, the sensation of pins and needles in his feet, and pain and numbness worsening throughout the day.  (Tr. 2117).  Dr. Smith also noted that Torchik had not yet tried GBP (Gabapentin) or Lyrica.  (Tr. 2117).  Dr. Smith diagnosed Torchik with alcoholic peripheral neuropathy, prescribed Gabapentin and a daily multivitamin and referred him to physical therapy.  (Tr. 2118).  Torchik's physical examination demonstrated reduced strength in his lower extremities but also showed a negative Romberg test and gait within normal limits (except for tandem gait).  (Tr. 2117-2118).

Shortly thereafter, Torchik began outpatient physical therapy with Lake Health Rehabilitation Services, completing 13 visits between April 29, 2021 and October 2021.  (Tr. 2269); *see generally* (Tr. 2210-2245; 2269-2313).  Progress notes from July 2021 show that

Torchik estimated a 25% improvement since the onset of physical therapy, and he stated that he felt better and did not require assistive devices.  (Tr. 2284).  The same month, a "Dynamic Gait Index Scoring Form" indicated that Torchik had several mild and moderate limitations in his ability to walk.  (Tr. 2276-2277).  Torchik's discharge summary report stated that he was improving with physical therapy and that he was unable to continue because he could not secure transportation.  (Tr. 2269).

On October 15, 2021, Torchik had a follow-up appointment with Dr. Smith concerning his alcoholic peripheral neuropathy.  (Tr. 2256).  Torchik reported that he had stopped physical therapy, he felt off balance when he stood up, and that using a cane or furniture helped with his symptoms.  (Tr. 2256).  Torchik's review of systems, general examination, and neurological examination were largely unremarkable, with: (i) "no Trouble with walking or balance"; (ii) "no drift, normal strength in BUE and reduced strength in BLE worse on the LLE than the RLE"; and (iii) a negative Romberg test and gait being within normal limits except for marked failure of tandem gait.  (Tr. 2256-2257).

On April 29, 2022, Torchik submitted a form to the Lake County Department of Job and Family Services, in which Dr. Smith stated that: (i) Torchik suffered from severe sensory neuropathy and gait instability; (ii) the illness was permanent and progressive; and (iii) the illness/injury prevented Torchik from working on his feet at his current skill set.  (Tr. 2342).

### C.    Opinion Evidence

#### 1.    Tim Alesnik – Physical Therapist

On August 18, 2021, Torchik's physical therapist, Tim Alesnik, submitted a check-list style form titled: "Medical Source Statement: Patient's Physical Capacity."  (Tr. 2184-2185). Mr. Alesnik noted that Torchik's lifting/carrying, standing/walking, and sitting, were all affected by his impairment, with Torchik being able to: (i) lift and/or carry five to ten pounds

occasionally and less than five pounds frequently; (ii) stand and/or walk two to three hours total and half an hour without interruption; and (iii) sit six to eight hours total and one hour without interruption.  (Tr. 2184).  Mr. Alesnik indicated that Torchik could: (i) never climb or balance; (ii) rarely stoop, crouch, or crawl; (iii) occasionally kneel; (iv) rarely engage in reaching or fine manipulation; and (v) occasionally engage in pushing/pulling and gross manipulation.  (Tr. 2184-2185).  Mr. Alesnik indicated that heights, moving machinery, and temperature extremes affected Torchik's impairment.  Mr. Alesnik left blank the portions of the form that asked what his medical findings were that supported the above assessments.  (Tr. 2184-2185).

The form further indicated that Torchik: (i) had been prescribed a cane; (ii) needed to alternate positions between sitting, standing, and walking; (iii) experienced moderate pain, but that pain did not interfere with concentration; and (iv) required an additional one to two hours of additional unscheduled rest during an eight-hour workday.  (Tr. 2185).

### 2.     Dr. Kristen Smith – Neurologist

On December 6, 2021, Dr. Smith submitted the same form as Mr. Alesnik, titled: "Medical Source Statement: Patient's Physical Capacity."  (Tr. 2314-2315).  Dr. Smith indicated that Torchik's lifting/carrying was affected by impairment, noting that his unstable gait put him at a risk of falls, but she did not opine on the limits of his lifting and carrying.  (Tr. 2314).  Dr. Smith indicated that Torchik's standing/walking was affected by impairment, noting that his "[n]europathy results in pain", and stating that he could walk one to three hours total in an eight-hour workday.  (Tr. 2314).  Dr. Smith indicated that Torchik's sitting was not affected by impairment.  (Tr. 2314).  Without providing medical findings to support her assessment, Dr. Smith indicated that Torchik could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push/pull, or engage in fine and gross manipulation.  (Tr. 2314-2315).  Dr. Smith found no environmental restrictions.  (Tr. 2315).

6

The form further indicated that Torchik: (i) had been prescribed a cane; (ii) needed to alternate positions between sitting, standing, and walking; (iii) experienced moderate and severe pain that interfered with concentration, took him off-task, and caused absenteeism; and (iv) required additional unscheduled rest during an eight-hour workday – with Dr. Smith not providing the amount of additional rest needed.  (Tr. 2315).

### 3.   State Agency Consultants

On initial review, state agency reviewing medical consultant Diane Manos, M.D., completed an assessment of Torchik's physical residual functional capacity ("PRFC").  (Tr. 75-76, 83-84).  For exertional and postural limitations, Dr. Manos found that Torchik could: (i) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (ii) with normal breaks, stand and/or walk about 6 hours and sit about 6 hours in an 8-hour workday; (iii) occasionally climb ramps or stairs (but never climb ladders, ropes, or scaffolds); and (iv) handle occasional balancing.  (Tr. 75, 83).  As for environmental limitations, Dr. Manos found that Torchik must avoid all exposure to hazards, specifically unprotected heights.  (Tr. 76, 84).  Dr. Manos cited Torchik's hypertension, an alcohol dependance with impairment of liver function, which included fatigue and frequent falls, as the basis for her assessments.  (Tr. 75-76, 83-84).  She also noted that Torchik was improving with treatment.  (Tr. 75-76, 83-84).  At the reconsideration level, Abraham Mikalov, M.D., reviewed and affirmed Dr. Manos's findings as to Torchik's PRFC.  (Tr. 91-92, 98-99).

### D.   Testimonial Evidence

At the ALJ hearing, Torchik testified that he had trouble sitting, standing, and lifting things because his legs would go numb and tremble if he did any of those activities for too long. (Tr. 49).  He further testified that he: (i) used a cane to help walk but prefers a walker; (ii) can only stand for about 10-15 minutes without the use of an assistive device; (iii) can sit for only

15-20 minutes before he needs to stand up; and (iv) can only walk 15-20 yards without the use of an assistive device.  (Tr. 49-51).  Torchik testified that he lives with a couple roommates that help him with household chores, he can do his own grocery shopping, and he can drive up to around seven miles at a time.  (Tr. 51-53).

Rebecca Kendrick, a Vocational Expert ("VE"), also testified at the ALJ hearing. (Tr. 60-66).  The ALJ posed her first hypothetical, asking the VE whether she could identify work for a hypothetical individual who could: (i) lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; (ii) never climb ladders, ropes, or scaffolds; and (iii) occasionally balance and avoid all work in unprotected heights.  (Tr. 60).  The VE testified that this hypothetical individual could perform the following jobs: (i) merchandise marker – light exertional level, SVP 2; (ii) cleaner housekeeping – light exertional level, SVP 2; and (iii) cashier II – light exertional level, SVP 2.  (Tr. 60-61).

The ALJ and the VE had the following exchange concerning two more hypotheticals:

[ALJ] Hypothetical #2, if I was to add that the person would alternate positions between standing and walking, with no off task, about 30 minutes and that could even be alternating positions between standing, walking, and sitting 30 minutes. You know I can put them all in there, between standing, walking, and sitting, with no off task, about 30 minutes.  How would that impact your answer?

[VE] With the note that there would no off task, Your Honor, there would be no changes.

[ALJ] Hypothetical #3, if I was to add to either hypothetical 1 or hypothetical #2 that the person would be off task 10% of the day, how would that impact your opinion?

[VE] There would be no changes, Your Honor.

[ALJ Okay. At what point does off task impact your opinion?

[VE} If an individual will be off task more than 15% of the workday, excluding breaks and lunches, it is work preclusive and this approximates to no more than eight minutes per hour and does not allow an individual to leave the workstation.

(Tr. 61).  The ALJ then asked whether the VE's answer was impacted if the following limitation was added to the first two hypotheticals: "the person would come in late one day a month, leave work early another one day a month, and be absent a third day a month[.]"  (Tr. 62).  The VE testified that these added limitations would be work preclusive.  (Tr. 62).

During cross-examination by Torchik's counsel, the VE testified that it would be work preclusive if an individual alternated between sitting, standing, and walking every 15 minutes. (Tr. 63-64).  Torchik's counsel also asked the VE whether her answer would change if the person in the first hypothetical required the use of a cane for walking and standing.  (Tr. 66).  The VE stated: "Yes.  The use of a cane at the light level is work preclusive and the use of a cane at the sedentary level is work preclusive if it's required for both standing and balance."  (Tr. 66).

## III.    The ALJ's Decision

On June 28, 2022, the ALJ issued an unfavorable decision.  (Tr. 15-30).  At Step Two, the ALJ determined that Torchik had the following severe impairments: chronic kidney disease, cirrhosis of the liver, alcohol abuse in early remission, and alcohol related peripheral neuropathy. (Tr. 18).  At Step Four, the ALJ determined that Torchik had the residual functional capacity ("RFC") to perform work at a light exertional level, except that he was further limited in the following respects:

> [Torchik] can lift and carry 20 pounds occasionally and 10 pounds frequently; occasionally climb ramps and stairs, but never climb ladders ropes or scaffolds; occasionally balance; and should avoid all work in unprotected heights.

(Tr. 22).

### A.    Analysis of Torchik's Subjective Symptom Complaints and Medical Evidence

In coming to this determination, the ALJ reviewed Torchik's statements concerning the intensity, persistence, and limiting effects of the symptoms from his underlying physical and mental impairments, and he determined that they were not entirely consistent with the medical

evidence and other evidence in the record.  (Tr. 22-23).  The ALJ acknowledged Torchik's

testimony that he had quit going to physical therapy because it caused too much pain, but

contrasted it with the following evidence:

> However, in July 2021, the physical therapist documented in the chart that the claimant reported a 25% improvement in his functional abilities since the start of physical therapy. The therapist also documented that the claimant "Feels better. Doesn't require assistive device a couple days after PT. . . ." ([Tr. 2284]).  When this statement was brought to his attention, he testified he has no idea why the physical therapist would write this.

(Tr. 22).

The ALJ determined that the physical limitations in the RFC were supported by record

evidence, noting:

> While there is some indication of the claimant using a cane in the record, physical therapy treatment notes from July 2021 state that the claimant reported about 25% improvement and that he didn't require an assistive device as often ([Tr. 1293]). The claimant testified that he discontinued physical therapy in August 2021 despite it still being recommended as a treatment modality because of pain and no improvement (Hearing Testimony).  This is not fully consistent with treatment notes indicating improved functioning ([Tr. 2227, 2284, 2298]).  Although the claimant has alleged he has even greater limitations, those allegations are not consistent with the overall evidence of record, including findings on examination and treatment sought and provided.
>
> For example, neurology records note that prior to April 2021, the claimant had not been prescribed gabapentin. On this date, he was prescribed the medication and told to return.  However, there are no records indicated he returned or what his response was to this medication.  Regardless, the above physical therapy notes do indicate improvement with another form of treatment.

(Tr. 23).

The ALJ addressed Torchik's alcoholism and alcohol related peripheral neuropathy and

found that his impairments had improved and responded positively with therapy and

conservative treatment.  (Tr. 23-24).  The ALJ further noted that: (i) physical examinations

revealed varying findings on Torchik's lower extremity motor strength, with some findings

showing no or limited weakness; and (ii) Torchik reported feeling pins and needles in his feet in

April 2021, but he had not yet taken Gabapentin or Lyrica and he denied having problems with bathing, dressing, cleaning, or shopping in treatment notes from the following month.  (Tr. 24). The ALJ noted that gait findings throughout the record had been consistently normal except for tandem gait testing, which the ALJ stated were not definitive.  (Tr. 24-25 & n.1).

The ALJ then addressed why the limitations found in the RFC were appropriate, stating:

> A broad light [exertional level] residual functional capacity with some additional postural and environmental restrictions is appropriate because the claimant's cirrhosis of the liver is stable with only mild ascites ([Tr. 1607]) and his chronic kidney disease is also stable without complication (e.g., [Tr. 2094]).  Imaging was consistent with fatty liver (Exhibits [Tr. 622, 1425]).  The claimant had an episode of acute onset kidney failure in conjunction with bilateral pneumonia in August 2020, for which he was admitted to in-patient care ([Tr. 288-999, 1268-1980]). However, with a brief course of dialysis renal function improved ([Tr. 1846]). Notes indicate the condition does not require any further dialysis treatment (Id.). Upper extremity findings throughout the medical record have been wholly normal (e.g., [Tr. 1152, 1361, 1393, 1956, 2011, 2118, 2155]). Sensation findings have generally been within normal limits (e.g., [Tr. 303, 1010, 1035, 1045, 1057, 1110, 1940, 2011, 2027]).  However, there have been some notes indicating reduced vibration and proprioception in his lower extremities ([Tr. 2118, 2126, 2152, 2257]).
> Thus, while the medical evidence supports a finding that the claimant has a "severe" impairment, the objective findings on imaging studies and the course of medical treatment do not support the claimant's allegations of an inability to perform all work.  Rather, the objective findings of record support a determination that the claimant retains the ability to perform a range of work at the light exertional level.
>
> Although the claimant has alleged he would be unable to work even within the restrictive limitations set forth in finding number five, consideration of the factors in SSR 16-3p and 20 CFR 416.929 leads the undersigned to find that those allegations are not consistent with the overall record evidence.  As referenced above, findings on examination have been generally mild to moderate and treatment has been conservative with some improvement in symptoms.

(Tr. 26).

## B.    Rejection of a Cane Limitation

The ALJ specifically addressed why she did not include a limitation for the use of a cane in the RFC, stating:

> First, there is a significant difference between an ability to walk in a normal fashion as opposed to performing a tandem gait test.  Most of the claimant's evaluations

11

noted he was able to walk with a normal gait.  It was only when performing the tandem gait test that he had some difficulty.  But, a person does not walk throughout the day in a tandem fashion—it is used primarily as a tool to evaluate a person's balance.  Even if a person may have difficulties performing the tandem gait test, that does not automatically translate to the conclusion that the person has difficulty walking in general or must use a cane. In this case, there is nothing to indicate he continued to need or use a cane beyond August 2021.  Notes from physical therapy show that in July 2021, [claimant] reported he had a 25% improvement in his symptoms since starting physical therapy ([Tr. 2284]).  He reported not using his crutch as much ([Tr. 2284]).  At the hearing he said he stopped physical therapy because it caused him pain, and the treatment would not likely improve his function because "the damage was already done" (Hearing Testimony).  However, the record does not contain repeated complaints of pain from the claimant, and instead, the record notes the claimant reporting transportation issues as the reason why he did not continue with physical therapy ([Tr. 2210]).  In addition, as discussed above, the claimant had minimal objective lower extremity findings. As of April 2021, he could walk with a normal gait, though he had a "marked failure of tandem gait." The Romberg test for balance was negative.  His motor strength was reduced on the left lower extremity[,] but no quantification was documented.  He had a reduced vibratory sensation and proprioception in the lower extremities but normal in the upper extremities. ([Tr. 2152]) At this same exam, it was noted had never been on gabapentin.  The medication was prescribed but no follow up examinations were submitted to the record to review medication efficacy or impact on functioning. The neurologist did not prescribe a cane, ([Tr. 1940, 1956, 2011, 2027, 2118, 2121, 2126, 2152, 2155, 2160, 2257, 2310]).  Upon that evidence, therefore, it is reasonable to infer that his function would have continued to improve had he continued with the conservative physical therapy treatment and medication. Therefore, a cane was not determined to be medically necessary and a restriction for its use was not utilized in the RFC.

(Tr. 25-26).

## C.    Analysis of Expert Opinions

### 1.    State Agency Consultants

The ALJ found the opinions of the state agency consultants to be persuasive, noting that the functional limitations they assessed were essentially identical to those found in the RFC. (Tr. 26).  The ALJ found their opinions to be supported by "a thorough review of the evidence with citations and explanations for the claimant's limitations up to the date of evaluation, including the opinion he was 'improving with treatment.'"  (Tr. 26-27).  She also found the opinions to be "generally consistent with the evidence of record, demonstrating mostly normal

gait, some tandem gait instability, but intact sensation, 2+ deep tendon reflexes, and 4-5/5 lower extremity motor strength (e.g., Exhibits [Tr. 1940, 1956, 2011, 2027, 2118, 2121, 2126, 2152, 2155, 2160, 2257, 2310]).”  (Tr. 27).

### 2.   Mr. Alesnik's Physical Capacity Form

The ALJ summarized the limitations and findings provided in the "Medical Source Statement: Patient's Physical Capacity" form submitted by Torchik's physical therapist, Tim Alesnik.  (Tr. 27).  The ALJ found that Mr. Alesnik's opinion was not fully persuasive, stating:

> [I]t has some internal inconsistencies, such as noting moderate pain but indicating that it will not interfere with concentration and while there are significant postural limitations, there is no need to elevate the legs.  The opinion is also not supported by the clinician's own exam findings noting improving gait, 0/10 post-treatment pain, and decreased use of cane when ambulating ([Tr. 2210-2211, 2226, 2281-2282, 2291, 2293, 2295, 2297, 2305-2306]).  Moreover, Mr. Alesnik's treatment notes indicate that the claimant had not completed enough session to assess progress ([Tr. 2306]).  The opinion is also not wholly consistent with the other evidence of record showing some tandem gait instability, but intact sensation, 2+ deep tendon reflexes, and 4-5/5 lower extremity motor strength (e.g., [Tr. 1940, 1956, 2011, 2027, 2118, 2121, 2126, 2152, 2155, 2160, 2257, 2310]).

(Tr. 27).

### 3.   Dr. Smith's Physical Capacity Form

The ALJ summarized the limitations and findings provided in the "Medical Source Statement: Patient's Physical Capacity" form submitted by Dr. Smith.  (Tr. 27).  The ALJ found that Dr. Smith's opinion was generally unpersuasive, stating:

> [Dr. Smith] failed to provide any narrative support or reference to her own exam findings including negative Romberg, wholly normal upper extremity findings, generally intact sensation, and no ataxia (see generally [Tr. 2106-2171, 2246-2258]).  The opinion is overly restrictive and inconsistent with the other medical evidence of record demonstrating some tandem gait instability, but intact sensation, 2+ deep tendon reflexes, and 4-5/5 lower extremity motor strength (e.g., [Tr. 1940, 1956, 2011, 2027, 2118, 2121, 2126, 2152, 2155, 2160, 2257, 2310]).

(Tr. 27-28).

### IV.   Law & Analysis

A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

"Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct.

1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v.

NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the

claimant's position, the Commissioner's decision still cannot be overturned "'so long as

substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of

Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*,

336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew,

evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary

that this court agree with the Commissioner's finding," so long as it meets this low standard for

evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d

778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo."(quotation omitted)).  This is

so because the Commissioner enjoys a "zone of choice" within which to decide cases without

being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

But, even if substantial evidence supported the ALJ's decision, the court will not uphold

that decision when the Commissioner failed to apply proper legal standards, unless the legal

error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A]

decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when]

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

And the court will not uphold a decision when the Commissioner's reasoning does "not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

### B.    Step Four – Physical Limitations in the RFC

Torchik raises three assignments of error that ultimately concern the physical limitations found in the RFC: (i) the ALJ failed to create a logical bridge between the evidence and her RFC findings; (ii) the ALJ improperly rejected the medical opinions of Mr. Alesnik and Dr. Smith, who both found more restrictive physical limitations than those in the RFC; and (iii) the ALJ improperly determined that a cane was not medically necessary. ECF Doc. 10 at 10-17.

### 1.    Whether the ALJ Created a Logical Bridge

Torchik argues that the ALJ failed to build a logical bridge between the record evidence and her RFC findings, and specifically the finding that Torchik was capable of performing light work, because: (i) substantial evidence supported a more restrictive RFC and a limitation to sedentary work; (ii) the ALJ selectively identified evidence that minimized Torchik's condition; and (iii) the ALJ failed to cite or discuss evidence in the record that supported a more restrictive RFC.  ECF Doc. 10 at 14-16.  The Commissioner disagrees, arguing that the ALJ met the required evidentiary threshold when she both provided a detailed basis for the restrictions in the RFC and cited substantial evidence in support of those restrictions.  ECF Doc. 11 at 9-10.

The court finds Torchik's argument to be unpersuasive.  First, the regulations do not require the ALJ to discuss or cite every piece of evidence in her opinion.  *See Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Jenkins v. Colvin*, No. 5:15-CV-1165, 2016 U.S. Dist. LEXIS 26105, at *28 (N.D. Ohio Feb. 11, 2016) ("Although an ALJ is required to *consider* all of the evidence in the record, he is not required to *discuss* each item of evidence in [his] opinion." (alternation in original)), *report and recommendation adopted*, No. 5:15 CV 1165, 2016 U.S. Dist. LEXIS 26095 (N.D. Ohio Mar. 1, 2016).  Thus, contrary to Torchik's assertion, the ALJ was not required to "cite to all the evidence" or explicitly discuss portions of the record that Torchik believes support a more restrictive RFC.  *See* ECF Doc. 10 at 15.  The ALJ's decision reflects that she considered all relevant evidence in the record, with the ALJ explicitly stating that she did, (Tr. 18, 22), and the ALJ provided a thorough summary of, and extensively cited to, the record evidence at Steps Two, Three, and Four, (Tr. 18-28).  *See Kornecky v. Comm'r of Soc.*

16

*Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).

Second, the Commissioner's findings are not subject to reversal merely because there may exist substantial evidence in the record to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen*, 800 F.2d at 545); *see also His v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."); *O'Brien*, 819 F. App'x at 416.  The court finds that Torchik has misconstrued the relevant standard and mistakenly focused on evidence which allegedly would support a more restrictive RFC.  *See* ECF Doc. 10 at 15.  But the applicable standard focuses on whether the evidence cited by the ALJ to support her findings clears the low substantial evidence hurdle, not whether some other evidence might have led to a different result. *Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241; *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion."). Even if a preponderance of the evidence could support a finding for a more restrictive RFC, the ALJ's decision cannot be second-guessed when it was reasonably drawn and falls within the Commissioner's "zone of choice."  *O'Brien, 819 F. App'x at 416*; *Jones*, 336 F.3d at 477; *Mullen*, 800 F.2d at 545.

The ALJ's determination that Torchik had the RFC to perform work at a light exertional level is supported by substantial evidence.  Such evidence includes: (i) physical therapy and treatment notes indicating improved functioning; (ii) physical examination findings that showed varied lower extremity strength, with many tests showing 5/5 or normal strength; (iii) consistent

17

findings of normal gait, save some tandem gait instability; (iv) Torchik's conservative physical therapy treatment and medication; and (v) sensation findings that were generally normal. (Tr. 303, 1035-1054, 1057, 1121-1123, 1293, 2106-2171, 2284, 2276-2277, 2269, 2256-2257, 2284, 2298).

Moreover, the ALJ's RFC is supported by the opinions of the state agency consultants, which the ALJ found to be persuasive and set forth functional limitations nearly identical to the RFC.  *See* (Tr. 22, 26-27, 75-76, 83-84, 91-92, 98-99).  It is well settled that a state agency consultant's opinion may constitute substantial evidence supporting an ALJ's RFC determination.  *Hefflin ex rel. LDS v. Kijakazi*, No. 1:20-cv-01414, 2021 U.S. Dist. LEXIS 187647, at *18-20 (N.D. Ohio Sept. 30, 2021) (collecting cases); *Maust v. Colvin*, No. 5:13-cv-02353, 2014 U.S. Dist. LEXIS 137635, at *16-17 (N.D. Ohio Sep. 29, 2014) (same); *see Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 568 (6th Cir. 2009).  Thus, with Torchik not raising any challenges to the state agency consultants' opinions or the ALJ's analysis/conclusions regarding those opinions, the court finds that the ALJ's RFC determination was supported by substantial evidence.  *See, e.g.*, *Harcula v. Comm'r of Soc. Sec.*, No. 1:22-CV-01950-CEF, 2023 U.S. Dist. LEXIS 165360, at *37-38 (N.D. Ohio Aug. 31, 2023) ("Thus, an RFC determination that is based upon the medical opinions of state agency consultants is generally supported by substantial evidence.").

To summarize, the ALJ not only applied the proper legal procedures and reached a decision supported by substantial evidence, but she sufficiently explained her decision in a manner which allows us to track her reasoning and understand how she found that Torchik was capable of performing work at a light exertional level.  In other words, the ALJ reasonably explained how she formulated the RFC such that we can understand how she reached her ultimate conclusions.  Accordingly, the ALJ's decision created the requisite logical bridge

between the evidence and the result.  *See Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at
241.

### 2. Whether the ALJ Properly Discounted Opinion Evidence

Torchik argues that the ALJ failed to apply proper legal standards in evaluating and
discounting the medical opinions of Mr. Alesnik and Dr. Smith because: (i) the ALJ parsed
through the record to find evidence that undermined those expert opinions; (ii) the ALJ ignored
and failed to address supporting evidence in the record; and (iii) "the medical record is fully
consistent with Mr. Alesnik and Dr. Smith's central finding that Mr. Torchik's neuropathy
markedly interferes with his everyday life."  ECF Doc. 10 at 10-14.  The Commissioner
disagrees, arguing that: (i) the ALJ properly considered the supportability and consistency of Mr.
Alesnik's and Dr. Smith's opinions; and (ii) Torchik points to evidence in the record that
supports his position, but this approach is insufficient to demonstrate a lack of substantial
evidence.  ECF Doc. 11 at 6-9.

Regarding Torchik's challenges to the ALJ's evaluation of Mr. Alesnik's and Dr. Smith's
opinions, the court finds that the ALJ applied the proper legal standards in discounting those
opinions.  Torchik primarily argues that the ALJ erred because the two medical opinions were
consistent with each other and with the medical record, and the ALJ failed to refer to or discuss
record evidence that supported those opinions.  *See* ECF Doc. 10 at 12-14.  The court rejects
these arguments for the same reasons provided in the preceding section.  First, the regulations do
not require an ALJ to cite or discuss any particular piece of evidence in evaluating medical
opinions.  *See Conner*, 658 F. App'x at 254; *Simons*, 114 F. App'x at 733.  Second, the
applicable standard focuses on whether the ALJ's conclusion – not an alternate theory offered by
the claimant – was supported by substantial evidence, a low evidentiary threshold to clear.
*Biestek*, 139 S. Ct. at 1154; *Rogers*, 486 F.3d at 241.  As discussed above, the RFC and the

ALJ's decision were supported by substantial evidence.  Thus, the court finds Torchik's primary arguments to be unpersuasive.  However, the court will review whether the ALJ otherwise followed the proper legal procedures in discounting Mr. Alesnik's and Dr. Smith's opinions.

An ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  An ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

Under the regulations, "supportability" means that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to his medical opinion, the more persuasive the medical opinion will be. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  "In other words, the supportability analysis focuses on the physicians' [own] explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 U.S. Dist. LEXIS 105354, at *4 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 U.S. Dist. LEXIS 61235, at *8 (E.D. Mich. Mar. 31, 2022)).  By contrast, "consistency" requires the ALJ to consider "the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  "Put simply, consistency

is about how the medical opinion conflicts with evidence in the record, whereas supportability is about how the medical opinion was soundly reached." *David C. v. Comm'r of Soc. Sec.*, No. 22-11292, 2023 U.S. Dist. LEXIS 199890, at *6 n.1 (E.D. Mich. Nov. 7, 2023) (citing SSR 96-2p, 1996 SSR LEXIS 9). "As long as the ALJ discussed the supportability and consistency of the opinion and supported his conclusions with substantial evidence within his decision, the Court will not disturb his decision." *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 U.S. Dist. LEXIS 87318, at *13 (N.D. Ohio May 13, 2022).

The court finds that the ALJ adequately addressed the supportability and consistency factors in her discussion of the persuasiveness of Mr. Alesnik's and Dr. Smith's opinions.  For Mr. Alesnik's opinion, the ALJ explained that the opinion was not fully persuasive because it: (i) contained some internal inconsistencies; and (ii) was "not supported by the clinician's own exam findings noting improving gait, 0/10 post-treatment pain, and decreased use of cane when ambulating."  (Tr. 27).  That was a supportability finding.  And the ALJ then stated that Mr. Alesnik's opinion was "not wholly consistent with the other evidence of record showing some tandem gait instability, but intact sensation, 2+ deep tendon reflexes, and 4-5/5 lower extremity motor strength."  (Tr. 27).  That was a consistency finding.  Similarly, for Dr. Smith's opinion, the ALJ explained that the opinion was generally unpersuasive because "she failed to provide any narrative support or reference to her own exam findings including negative Romberg, wholly normal upper extremity findings, generally intact sensation, and no ataxia."  (Tr. 27).  That was a supportability finding.  And the ALJ then stated that Dr. Smith's opinion was "overly restrictive and inconsistent with the other medical evidence of record demonstrating some tandem gait instability, but intact sensation, 2+ deep tendon reflexes, and 4-5/5 lower extremity motor strength."  (Tr. 27-28).  That was a consistency finding.

The ALJ's analysis of the consistency and supportability factors was also reasonable and sufficient to allow "a subsequent reviewer or a reviewing court to trace the path of [the ALJ's] reasoning." 82 Fed. Reg. 5844, 5858.  And substantial evidence bolsters the ALJ's conclusion that Mr. Alesnik's and Dr. Smith's findings of significant limitations in the ability to stand/walk were inconsistent with the record, including some of the same evidence discussed in the preceding section concerning physical therapy and treatment notes indicating improved functioning, physical examinations demonstrating normal strength in Torchik's lower extremities, and findings of normal gait function, save some tandem gait instability.  (Tr. 2106-2171, 2284, 2276-2277, 2269, 2256-2257, 2284, 2298).  The court is sensitive to Torchik's medical concerns.  But the record contains many findings indicating he had normal leg strength and sensation during the period under consideration.  And it was for the ALJ, not the court, to decide what was the most persuasive opinion evidence in light of that record.

Regardless, the ALJ could have rejected the opinions on separate, alternative grounds. Mr. Alesnik's and Dr. Smith's opinions were expressed on checklist/questionnaire forms, which contained little more than markings indicating their opinions on specific physical impairments but lacked any real explanation or citation to medical records.  (Tr. 2184-2185, 2314-2315). Courts within the Sixth Circuit have consistently determined that checklist opinions which lacked accompanying explanations, are unsupported, patently deficient, and create a sufficient reason to discount a medical opinion.  *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (finding that checkbox or checklist evidence was "'weak evidence at best' and meets our patently deficient standard") (citations omitted)); *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 U.S. Dist. LEXIS 20220, at *23 & n.5 (N.D. Ohio Jan 12, 2018) ("Numerous decisions have found that the use of checklist or check-the-box forms in which the doctor provides little or no accompanying explanation for the assessed limitations . . . are

unsupported and, therefore, the ALJ may properly discount the treating source opinions." (citing collected cases)); *Nolcox v. Berryhill*, No. 1:17-cv-02655, 2019 U.S. Dist. LEXIS 49412, at *24 n.5 (N.D. Ohio Mar. 25, 2019) (collecting cases).  Because Mr. Alesnik's and Dr. Smith's opinions lack sufficient explanation and citation to evidentiary support for their findings, their opinions are rendered patently deficient.  *See Hernandez*, 644 F. App'x 468, 474-75 (6th Cir. 2016); *Burgess v. Comm'r of Soc. Sec.*, No. 19-13243, 2021 U.S. Dist. LEXIS 58803, at *15 (E.D. Mich. Mar. 29, 2021); (Tr. 297); *see also Fleming v. Comm'r of Soc. Sec.*, No. 4:10-CV-25, 2011 U.S. Dist. LEXIS 81040, at *28 (E.D. Tenn. July 5, 2011).  Consequently, even if the ALJ had erred in analyzing these opinions, such error would be considered harmless given this independent ground for rejecting the opinions.  *See Paradinovich v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-1888, 2021 U.S. Dist. LEXIS 213589, at *24-25 (N.D. Ohio Sept. 28, 2021) (concluding similarly).

The court finds that the ALJ followed the proper procedures in discounting Mr. Alesnik's and Dr. Smith's opinions; and because those check-list style opinions could not possibly be credited, Torchik cannot establish reversible error.  *See Wilson*, 378 F.3d at 547.

### 3.    Whether the ALJ Properly Excluded a Cane Limitation

Torchik contends that the ALJ erred when she determined that the use of a cane was not medically necessary because she: (i) relied on information outside the scope of the record (namely an online definition of tandem gait testing); (ii) played the role of doctor by misinterpreting medical evidence and substituting her judgment on medical issues; and (iii) failed to address evidence supporting Torchik's medical need for a cane (*e.g.*, "the two treating provider statements which identified the need for a cane as prescribed").  ECF Doc. 10 at 16-17.  The Commissioner responds that Torchik's argument is without merit because he has failed to meet his burden of establishing the medical necessity of a cane under SSR 96-6p, which

requires medical documentation establishing both the need for a walking device *and* describing the circumstances for which it is needed.  ECF Doc. 11 at 10-11.  The Commissioner contends that: (i) there is no evidence in the record establishing the medical necessity of a cane because there is no evidence which describes the circumstances for which a cane is needed; and (ii) the opinions of Dr. Smith and Mr. Alesnik – the evidence Torchik relies upon – are insufficient because they simply contain checked boxes indicating a cane has been prescribed (with no information on circumstances for cane use).  *Id.* at 10-11.

SSR 96-9p addresses the circumstances in which an assistive device, such as a cane, is considered "medically required" and must be included in the RFC, providing:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).  The adjudicator must always consider the particular facts of a case.

SSR 96-9p, 1996 SSR LEXIS 6 at *19 (July 2, 1996).  SSR-96-9p essentially identifies two requirements for a cane to be deemed medically required: (1) there must be medical documentation establishing the need for the device to aid in walking/standing; *and* (2) that medical documentation must also describe the circumstances for which the device is needed.  *See Berry v. Saul*, No. 1:18-cv-01906, 2019 U.S. Dist. LEXIS 162145, at *23-24 (N.D. Ohio Sep. 23, 2019) (citing SSR 96-9p, 1996 SSR LEXIS 6 at *19); *Holmes v. Kijakazi*, No. 1:20-CV-01317, 2022 U.S. Dist. LEXIS 164381, at *30-31 (N.D. Ohio Sep. 12, 2022) (same).  The claimant's testimony as to the need or use of a cane does not qualify as "medical documentation."  *Mitchell v. Comm'r of Soc. Sec.*, No. 13CV01969, 2014 U.S. Dist. LEXIS 103257, at *25 (N.D. Ohio July 14, 2014), report and recommendation adopted, 2014 U.S. Dist. LEXIS 104106 (N.D. Ohio July 29, 2014).

The court finds no reversible error in the ALJ's decision to omit a restriction for the use of a cane in the RFC.  To establish that the use of a cane was medically required, Torchik points to evidence that he had a history of falls and gait instability and cites references in Mr. Alesnik's and Dr. Smith's opinions to a prescribed cane.  ECF Doc. 10 at 16-17.  As discussed above, there was substantial evidence to support the ALJ's decision to discount Mr. Alesnik's and Dr. Smith's opinions.  Moreover, those opinions did not indicate who prescribed the cane, when it was prescribed, or any other information regarding this prescription.  (Tr. 2184-2185, 2314-2315).  That said, even assuming *arguendo* that the evidence Torchik cited had satisfied the first requirement under SSR 96-9p (medical documentation establishing the need for the device to aid in walking/standing), Torchik has not identified any medical documentation or record evidence that describes the specific circumstances in which he allegedly required the use of a cane.  Thus, Torchik has failed to identify evidence that meets the standard articulated under SSR 96-9p.[1]  *See Berry v. Saul*, No. 1:18-cv-0190 6, 2019 U.S. Dist. LEXIS 162145, at *25-26 (N.D. Ohio Sep. 23, 2019) ("Plaintiff fails to draw this court's attention to any *medical records documenting and describing the circumstances for which a cane is needed* as required by SSR 96-9p, 1996 SSR

---

[1] The court has reviewed the 2347-page record and has not discovered any medical documentation that it can reasonably construe as describing the precise circumstances for when Torchik needed the use of a cane and satisfying the standard under SSR 96-6p.  Ultimately, it is not the court's role to scour the record for evidence to support a claimant's argument, as the responsibility is on the plaintiff to identify evidence in support of his assignment of error. *See Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("Judges are not like pigs, hunting for truffles that might be buried in the record." (alteration and quotation marks omitted)); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."); *Jones v. Comm'r of Soc. Sec.*, No. 3:12 CV 2986, 2013 U.S. Dist. LEXIS 126077, at *19 (N.D. Ohio July 30, 2013) ("[I]t is not the Court's function to search the . . . record for evidence to support [plaintiff's] 'argument' or find law supporting her claims."); *Maldonado v. Saul*, No. 1:20-cv-01120, 2021 U.S. Dist. LEXIS 143295, at *14-15 (N.D. Ohio July 26, 2021) ("The court cannot scour the record to uncover evidence supporting Plaintiff's argument without improperly assuming the role of advocate.")

LEXIS 6." (emphasis in original) (citing *Perry v. Berryhill*, No. 1:16CV2970, 2018 U.S. Dist. LEXIS 45609, 2018 WL 1393275, at *4 (N.D. Ohio Mar. 20, 2018)).

When a plaintiff asserts that an ALJ has erred by failing to include the use of a cane in the RFC, courts in this district have consistently determined that the plaintiff *must* identify documentation describing the circumstances for which a cane is needed in order to establish the medical necessity of a cane and a reversible error.  *See, e.g.*, *Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 U.S. Dist. LEXIS 69450, at *22-23 (N.D. Ohio Mar. 22, 2023); *Spies v. Saul*, No. 19-CV-2928, 2020 U.S. Dist. LEXIS 154854, 2020 WL 5044027, at *16 (N.D. Ohio Aug. 26, 2020) (collecting cases); *see also Fletcher v. Comm'r of Soc. Sec.*, No. 5:21-CV-02217-CEH, 2022 U.S. Dist. LEXIS 184608, 2022 WL 6156951, at *18 (N.D. Ohio Oct. 7, 2022); *Holmes v. Kijakazi*, No. 1:20-CV-01317, 2022 U.S. Dist. LEXIS 164381, at *32-33 (N.D. Ohio Sep. 12, 2022).  Because Torchik has not identified any such evidence, he has not satisfied the requirements under SSR 96-6p and thereby failed to establish that a cane was medically required.

Additionally, the ALJ found that a cane was not medically required and rejected a cane limitation in the RFC because there was evidence that Torchik could walk with a normal gait, outside of issues with tandem gait walking – with the ALJ concluding that issues with tandem gait walking did not reflect the need for a cane in normal walking.  (Tr. 25)  The ALJ also noted that there was a lack of evidence for the need or use of cane after August 2021, when Torchik's physical therapy notes indicated there was an improvement in his symptoms, and Torchik self-reported that he had a reduced need for an assistive device.  (Tr. 25)  The ALJ then discounted Torchik's subjective symptom complaints by noting that he claimed that he had stopped physical therapy because it was causing him pain, but the record contained no repeated reports of pain from the physical therapy, and the record reflected the reason for the discontinuance of therapy was due to transportation issues.  (Tr. 25)  The ALJ further noted that: (i) "the claimant had

minimal objective lower extremity findings"; (ii) Torchik had been prescribed Gabapentin for the first time but there was no follow-up examination or record evidence submitted to demonstrate the efficacy and impact of that medication; (iii) the neurologist did not prescribe a cane; and (iv) it was reasonable to infer that Torchik's functioning would have continued to improve had he continued his conservative physical therapy treatment and medication.  (Tr. 25-26).

The court finds that the ALJ applied the proper legal standards and substantial evidence supported her decision to find that a cane was not medically required.  While substantial evidence may exist to support a contrary finding, that does not establish a reversible error; and the record, at best, contains conflicting evidence as to the need for a cane.  In such circumstances, it is best to not disturb the ALJ's decision because, "[when] there is conflicting evidence concerning the need for a cane, it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence." *Forester v. Comm'r of Soc. Sec.*, No. 16-CV-1156, 2017 U.S. Dist. LEXIS 174791, 2017 WL 4769006 (S.D. Ohio Oct. 23, 2017) (internal quotation marks omitted).  Moreover, the decision of the ALJ is supported by the lack of medical evidence establishing the medical necessity of a cane and describing the circumstances that required the use of a cane (or any other assistive device), as required by SSR 96-9p.  Accordingly, the ALJ did not err in omitting the use of a cane from her determination of the RFC and Torchik's argument for remand lacks merit.

**V.       Conclusion**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Torchik's applications for DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: January 31, 2024

Thomas M. Parker
United States Magistrate Judge